O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN P. PRINGLE, Bankruptcy Trustee for the Estate of San Pedro Boat Works, Inc., | ) ) ) | Case No. CV 04-08495 DDP (RCx) |
| | ) | **ORDER GRANTING SUMMARY JUDGMENT** |
| Plaintiff, | ) ) | **TO WQIS AND EPG; DENYING** |
| | ) | **PLAINTIFF'S MOTION FOR SUMMARY** |
| v. | ) | **JUDGMENT** |
| | ) | |
| WATER QUALITY INSURANCE | ) | |
| SYNDICATE, an unincorporated | ) | [Motions filed on August 8, 2006, |
| syndicate organized under | ) | Dkt. No. 72, September 18, 2006, |
| the laws of the State of New | ) | Dkt. No. 97.] |
| York; ENVIRONMENTAL | ) | |
| POLLUTION GROUP, INC., a | ) | |
| Corporation organized under | ) | |
| the laws of the State of New | ) | |
| York; CERTAIN SOLVENT | ) | |
| LLOYD'S UNDERWRITERS THAT | ) | |
| SUBSCRIBED TO ENVIRONMENTAL | ) | |
| POLLUTION GROUP, INC., | ) | |
| POLICY NOS. 01-02001, 02- | ) | |
| 02001,03-02001, 04-02001, 5- | ) | |
| 02001 and 6-02001, unknown | ) | |
| foreign entities organized | ) | |
| under the laws of the United | ) | |
| Kingdom, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

I.   **BACKGROUND**

   A.   <u>The City Action</u>

      From approximately 1984 to 2003, San Pedro Boat Works ("SPBW") operated boatyards at Berths 44 and 57 in the Port of Los Angeles.[1] SPBW used copper-nickel sandblast material in its boatyard operations that it knew to "produce . . . slag containing hazardous wastes (*i.e.,* marine paint particles, residue etc.)." (SPBW Reply 3.)  Beginning in 1989, the City of Los Angeles (the "City") began investigating SPBW for alleged environmental pollution occurring at Berths 44 and 57. (SGI ¶¶ 6, 30-33.)  The City's 1989 investigation led to a June 1990 order requiring SPBW to investigate and remediate any contamination.

      In February 1992, SPBW purchased a marine pollution liability insurance policy from Water Quality Insurance Syndicate ("WQIS") with a one-year policy period ("Policy # 8602-<u>01</u>"). (SGI ¶ 34.) This policy covered specific pollution liabilities relating to SPBW's ownership and operation of three vessels – two drydocks referred to as AFDL 19 and AFDL 27 (collectively, "the drydocks") and a tugboat/towboat referred to as "Cindy M." (SGI ¶¶ 3-5.)  The drydocks were located and operated at SPBW's Berth 57 facility within the Port of Los Angeles. (SGI ¶ 5.)  SPBW then requested to renew its policy, and WQIS issued a second policy ("Policy # 8602-<u>02</u>"), which expired on February 1, 1994. (SGI ¶¶ 34-35.)  From February 1, 1994, through February 1, 2002, SPBW purchased similar marine insurance policies from Environmental Pollution Group, Inc. ("EPG") (collectively the "EPG Policies"). (SGI ¶ 12.)  While

---

[1] Unless otherwise noted, all facts relied upon by the Court are undisputed by the parties.

applying for the WQIS Policies, WQIS contends that SPBW did not disclose certain facts pertaining to the City's investigation into SPBW's potential environmental contamination.  WQIS contends that the omitted facts would have been material to its underwriting decisions.

In October 2002, the City sued SPBW for environmental contamination, claiming that hazardous substances generated in the ordinary course of operations had been stored in improper containers at both Berths 44 and 57 (the "City Action").  (SGI ¶ 37.)  London Market Insurers Underwriters ("LMI"), SPBW's insurer prior to WQIS, initially funded SPBW's legal fees, but terminated that funding as of October 2006.

B.   The Chapter 7 Bankruptcy Proceeding

Two months after the initiation of the City Action, in December 2002, SPBW filed for Chapter 7 bankruptcy protection. (SGI ¶ 38.)  As part of its bankruptcy petition, SPBW filed a Schedule B, under penalty of perjury, listing all of its personal property assets.  (RJN Ex. C; SGI ¶ 9.)  The Schedule B form specifically includes a category named "Interests in Insurance Policies." (Id.)  SPBW did not list its right to bring claims against its insurers WQIS and EPG. (SGI ¶ 10.)

In March 2003, SPBW's bankruptcy trustee John Pringle ("Trustee") filed a motion to abandon certain assets of SPBW's bankruptcy estate not listed in the Schedule B form ("non-scheduled assets").  (SGI ¶ 13.)  The Bankruptcy Court granted the Trustee's motion on April 25, 2003.  (SGI ¶ 14.)  The non-scheduled assets abandoned by the Trustee's motion and the Bankruptcy Court's order consisted of dry docks and cranes; and the motion and order did not

3

mention potential insurance claims against WQIS and EPG. (SGI ¶ 13.)

In April 2003, the City filed with the Bankruptcy Court a motion for relief from the automatic stay[2] to (1) take possession of Berths 44 and 57 from SPBW and (2) to continue the City Action against SPBW. (SGI ¶ 15.)  The Trustee filed a notice of non-opposition and the Bankruptcy Court granted the City's motion. (Id.; RJN Ex. H.)  The Bankruptcy Court's order stated, in pertinent part:

> "[The City] may enforce its remedies . . . to pursue and prosecute its action . . . including to obtain a final judgment therein against [SPBW] and to collect or enforce such judgment from any applicable insurance policies of [SPBW] and the insurers thereunder provided that the automatic stay shall remain in effect with respect to collection of any such judgment directly from [SPBW]."

(RJN Ex. I.)

In September 2003, the Trustee moved to abandon the assets of SPBW's bankruptcy estate listed in the Schedule B form ("scheduled assets") back to SPBW.  (SGI ¶ 17.)  The scheduled assets consisted of accounts receivable, a truck, a tow boat, office equipment, an insurance refund of $13,556, and SPBW's books and records.  (Id.) The Trustee's motion did not mention the potential claims against WQIS or EPG.  (Id.; RJN Ex. J.)  The Bankruptcy Court ordered SPBW's scheduled assets abandoned in October 2003.  (SGI ¶ 18; RJN Ex. K.)  Thereafter, the Trustee filed a report stating that SPBW had no scheduled assets of value to the bankruptcy estate.  (SGI ¶

---

[2] With the filing of a bankruptcy petition, a self-executing automatic stay is imposed pursuant to 11 U.S.C. § 362 ("§ 362 relief") that enjoins the commencement or continuation of any judicial proceedings against the debtor.  11 U.S.C. § 362; Catalano v. Comm'r, 279 F.3d 682, 686 (9th Cir. 2002).

4

1   19; RJN Ex. L.)   In December 2003, the Bankruptcy Court closed the

2   SPBW bankruptcy proceeding, considering it a "no asset" case.  (SGI

3   ¶ 20; RJN Ex. M.)   There were no distributions made to SPBW's

4   unsecured creditors.  (<u>Id.</u>)

5       C.   <u>The SPBW Action</u>

6       In March 2003, SPBW tendered a claim for defense and

7   indemnification to WQIS and EPG under the respective insurance

8   policies for claims made against it in the City Action.  (SGI ¶

9   14.)   WQIS allegedly learned during its investigation of the claim

10  that SPBW did not disclose facts pertaining to the City's

11  investigation.   WQIS contends that such facts are material to its

12  underwriting decisions and SPBW's failure to disclose it during

13  application entitled WQIS to unilaterally rescind the WQIS

14  Policies.   (SGI ¶¶ 15-16.)

15      After WQIS' unilateral rescission, SPBW sued WQIS in August

16  2004 alleging breach of contract and related claims ("SPBW

17  Action").   WQIS removed the SPBW Action to federal court and

18  counterclaimed for a declaration that the WQIS policies were

19  properly rescinded and are void, and that WQIS therefore has no

20  obligations to SPBW arising thereunder.   EPG was added as an

21  additional defendant in December 2005.

22      D.   <u>Procedural History</u>

23      On August 8, 2006, SPBW filed a motion for summary judgment

24  against WQIS, claiming that WQIS has a duty to defend SPBW in the

25  underlying City Action and that WQIS's counterclaim for rescission

26  is barred by the applicable statute of limitations.   On September

27  18, 2006, EPG filed a motion for summary judgment claiming that

28

SPBW has no standing in the SPBW Action due to its Chapter 7 bankruptcy.

On October 24, 2006 in a hearing before the Honorable Barry Russell, United States Bankruptcy Judge, counsel for all parties discussed the reopening of the bankruptcy estate for a determination by the Trustee of his stake in the rights at issue. At that hearing, counsel for John Pringle, the former Trustee, noted that he needed time to evaluate the value of the claims and determine if he would administer or abandon the claims.  Judge Russell ordered the case reopened and that Mr. Pringle be reappointed as Trustee for a determination of the status of the claims.

On January 19, 2007, in part responding to EPG's motion for summary judgment on the ground of SPBW's lack of standing, the Court sua sponte entered an Order Re: Standing of Plaintiff San Pedro Boat Works To Bring This Action on the issue of whether to delay this case for lack of party-in-interest standing.  In its Order, the Court found that SPBW was no longer a real party in interest in this matter.  In accordance with Federal Rule of Civil Procedure 17, the Court postponed all proceedings pending the decision of the reopened bankruptcy estate to give reasonable time for the real party in interest, the Trustee, to respond.  The Court further found that the Trustee, Pringle, did have standing.  On January 29, 2007, the Trustee, John Pringle, automatically substituted for debtor SPBW as plaintiff in the instant action by operation of law under 11 U.S.C. § 323 and Federal Rule 17(a).  In December 2007 and January 2008, in light of the Trustee's substitution as Plaintiff and the time that had elapsed since the

1  filing of the cross motions for summary judgment, the Court
2  afforded Pringle, WQIS, and EPG the chance to submit supplemental
3  briefing.  On January 28, 2008, the Court granted the City of Los
4  Angeles's motion for leave to intervene in the SPBW lawsuit.  On
5  the same day, the Court requested further supplemental briefing
6  from Plaintiff Pringle, Plaintiff-Intervenor City of Los Angeles,
7  and Defendant EPG on the question of whether the language of the
8  EPG Policies precluded relief for SPBW, and whether the Court
9  should reconsider its January 2007 Order finding that Pringle had
10 standing.  On April 9, 2008, the Court again requested supplemental
11 briefing from Plaintiff Pringle and Defendant WQIS on the question
12 of whether Defendant WQIS had validly rescinded the WQIS policies.
13 Finally, on May 15, 2008, the Court granted the parties further
14 time to supplement the record based on Plaintiff Pringle's
15 representation that there had not had been sufficient time to
16 conduct discovery in this matter.  The parties then stipulated to
17 an extension until October 24, 2008, to file their briefing.  On
18 that date, the parties submitted extensive supplemental evidence.
19      The Court now considers the parties' motions for summary
20 judgment.
21 **II.   LEGAL STANDARD**
22      Summary judgment is appropriate where "the pleadings, the
23 discovery and disclosure materials on file, and any affidavits show
24 that there is no genuine issue as to any material fact and that the
25 movant is entitled to a judgment as a matter of law."
26 Fed. R. Civ. P. 56(c).  In determining a motion for summary
27 judgment, all reasonable inferences from the evidence must be drawn
28 in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc.,

1   477 U.S. 242, 255 (1986).   A genuine issue exists if "the evidence
2   is such that a reasonable jury could return a verdict for the
3   nonmoving party"; and material facts are those "that might affect
4   the outcome of the suit under the governing law."  <u>Anderson</u>, 477
5   U.S. at 248.   However, no genuine issue of fact exists "[w]here the
6   record taken as a whole could not lead a rational trier of fact to
7   find for the non-moving party."  <u>Matsushita Elec. Indus. Co. v.</u>
8   <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

9   **III. DISCUSSION**

10      The Court has before it three motions for summary judgment.
11  Plaintiff moves for summary judgment on WQIS's duty to defend it
12  under its insurance policies.   Defendant WQIS moves[3] for summary
13  judgment as to the validity of its rescission of the WQIS policies.
14  Defendant EPG brings a motion for summary judgment against
15  Plaintiff, arguing that Pringle lacks standing because he cannot
16  possibly obtain any relief against EPG.   The Court GRANTS both
17  WQIS's and EPG's motions.   Plaintiff's motion is DENIED.

18      A.   <u>Plaintiff Pringle's and Defendant WQIS's Motions</u>

19      In January 1992, WQIS issued to SPBW a one-year term marine
20  insurance policy.   The policy insured three vessels:  two drydocks
21  permanently located and operated at SPBW's Berth 57 in the Port of
22  Los Angeles; and one tugboat referred to as Cindy M.  On March 12,
23  1993, SPBW renewed the same policy (collectively "WQIS Policies").
24  Coverage under the WQIS Policies terminated on February 1, 1994.

25  ─────────────

26      [3] WQIS's motion originated as an opposition to Plaintiff's
    motion for summary adjudication on whether WQIS had a duty to
27  defend.   After determining it would be in the interest of judicial
    economy to decide the question of rescission first, the Court
28  converted this briefing into a motion for summary judgment by WQIS
    on the validity of its rescission.

1        The pertinent portions of the WQIS Policies read:

2            [T]he Subscribers to the WATER QUALITY INSURANCE
3        SYNDICATE (WQIS) do hereby agree to:
             (1) Indemnify the Assured for such amounts as the Assured
4        shall have become liable to pay and shall have paid as owner
         or operator of the vessel named on the Vessel Schedule
5        attached to and forming part of this Policy, hereafter the
         "Vessel", and if more than one Vessel is named, all clauses
6        shall apply as though a separate Policy had been issued for
         each,
7            (2) Reimburse the Assured for such certain other costs
         and expenses, as described below, which the Assured shall have
8        by reason of or with respect to:
         . . .
9                              SECTION C
             Liability imposed under Section 107(a)(1) of the
10       Comprehensive Environmental Response, Compensation and
         Liability Act of 1980 (Public Law 96-510), hereafter "CERCLA",
11       and costs and expenses incurred by the Assured for removal,
         response or remedial action (as "removal", "response" and
12       "remedial action" are defined under Section 101 of CERCLA) for
         which liability would have been imposed under Section
13       107(a)(1) of CERCLA had the Assured not undertaken such
         removal, response or remedial action voluntarily.  Liabilities
14       imposed under any other Section or Subsection of CERCLA are
         specifically EXCLUDED.

15  WQIS contends that because SPBW failed to disclose certain material

16  facts relating to the City's pollution investigation on the

17  applications[4] for the WQIS Policies, WQIS had the right to

18  unilaterally rescind the Policies.  Because validly rescinded

19  policies are null and void ab initio, argues WQIS, any obligation

20  potentially arising from those policies, such as the duty to

21  reimburse SPBW for its defense and investigation expenses in the

22  City's lawsuit, is likewise extinguished.  Plaintiff Pringle

23  counters that the rescission was not valid, and alternatively

24  rescission is barred by the statute of limitations, waiver, and

25  estoppel.

26

27  _____

28       [4] These applications were oral and not reduced to written
    form.

                                    9

1          1.  <u>Rescission</u>

2            a.  <u>Legal Standard</u>

3      The parties dispute whether federal admiralty law or

4  California law applies to the insurance policies in this case.  The

5  Ninth Circuit has confirmed that vessel liability insurance – which

6  the WQIS policies are – is marine insurance, that "courts should

7  look first to federal admiralty law" in interpreting marine

8  insurance policies, and that <u>uberrimae fidae</u> is an "established

9  federal maritime law rule" that applies to such insurance.  <u>Certain</u>

10 <u>Underwriters at Lloyds, London v. Inlet Fisheries Inc.</u>, 518 F.3d

11 645, 649-55 (9th Cir. 2008).  "The doctrine of <u>uberrimae fidae</u>

12 imposes a duty of utmost good faith, and requires that an insured

13 fully and voluntarily disclose to the insurer all facts material to

14 a calculation of the insurance risk."  <u>Id.</u> at 648 (internal

15 citation and quotation marks omitted).  Further, an insured is

16 "obligated to disclose all material information, regardless of a

17 request by" the insurer.  <u>Id.</u>  "An insurer may rescind an insurance

18 contract if it can show either intentional misrepresentation of a

19 fact, regardless of materiality, or nondisclosure of a fact

20 material to the risk, regardless of the risk."  <u>Id.</u> at 655

21 (internal quotation marks omitted).

22           b.  <u>Application</u>

23     The Court finds that there is no genuine issue of material

24 fact, as would be necessary to preclude summary judgment, about

25 whether SPBW failed to disclose material information to WQIS when

26 applying for the WQIS policies.

27     Plaintiff Pringle asserts that WQIS has not provided any

28 evidence of this nondisclosure, but he is mistaken.  WQIS has

1   submitted the declaration of Richard Hobbie, President and CEO of

2   WQIS.  Hobbie's declaration states that he is familiar with the

3   WQIS underwriting criteria, that he reviewed WQIS' "entire

4   underwriting file relating to" SPBW, and that "there is no

5   evidence" in the file that SPBW disclosed, before applying for the

6   WQIS polices, that (1) "that it used hazardous heavy metal

7   sandblast media aboard the drydocks," (2) "that the marine sediment

8   in the immediate area of the Drydocks was known or alleged to be

9   contaminated with" that same material, (3) "that the Los Angeles

10  County Department of Health raised pollution concerns and issued

11  Notices of Violations relating to the drydocks," and (4) "that SPBW

12  had pollution problems that were being investigated by the

13  Hazardous Materials Control Program at the Department of Health."[5]

14  (Hobbie Decl. ¶¶ 7, 9, 11, 13, 15-18.)  Although Hobbie was not the

15  WQIS representative that conducted the application process, which

16  in this case was verbal, Hobbie nonetheless provides competent

17  evidence that WQIS has no record of SPBW ever disclosing the

18  abovementioned information.

19       In contrast, throughout the nearly three years and many

20  supplemental briefs presented to the Court since this motion was

21  filed in August 2006, Plaintiff has not alleged or presented

22  evidence that it did disclose:  (1) its use of hazardous heavy

23

24       [5] Pringle moves to strike the Hobbie declaration on the
    grounds that Mr. Hobbie fails to demonstrate the requisite personal
25  knowledge because he does not attach the underwriting file upon
    which he relies.  See Fed. R. Civ. P. 56(e)(1).  The Court declines
26  this request.  Rule 56(e)(1) states that "[i]f a paper or part of a
    paper is referred to in an affidavit," a copy must be attached.
27  Mr. Hobbie does not rely on information in a paper or part of a
    paper; he relies on the absence of information in a file.
28  Therefore, Hobbie's sworn declaration of what he did not discover
    in the file is competent evidence.

11

1  metal sandblast media aboard the drydocks, (2) the known or alleged

2  contamination of the marine sediment in the immediate area of the

3  drydocks at Berth 57 related to this sandblasting, or (3) the

4  violation notices issued by the City.  Instead, Plaintiff argues

5  that it disclosed the fact that it was under investigation by the

6  Los Angeles Department of Health for pollution at Berth 44.

7       Plaintiff, however, focuses on arguing that (1) allowing

8  verbal insurance contracts like the one in this case constitute bad

9  public policy because the insurer can manufacture alleged

10 nondisclosures after the fact, and that (2) any nondisclosures were

11 not material.  As to the first point, Plaintiff Pringle may have a

12 valid concern, but given that he does not in fact dispute the

13 alleged nondisclosures here, the concern is irrelevant.

14      As to the second, the Court disagrees.  Plaintiff spends

15 significant time in its briefs addressing whether sandblast

16 material is in fact hazardous, and what information about any such

17 hazards was so basic in the marine insurance industry that WQIS

18 should have known it by virtue of being such a large player in the

19 field.  These arguments miss the most important potential

20 nondisclosure:  that, at the time SPBW applied for the WQIS

21 policies, the Los Angeles Health Department and Hazardous Materials

22 Control Program had for several years been investigating possible

23 pollution by SPBW in areas including Berth 57 (where the WQIS-

24 insured drydocks were located), and indeed had issued several

25 Notices of Violation.  (See, e.g., Hobbie Decl. Ex. 14, June 7,

26 1990 Notice of Violation by LA Dep't of Health for "waste

27 paint/paint residue" at Berths 44 and 57); Id. Ex. 15 (June 1990

28 Report of Investigation by Hazardous Materials Controls Program

noting soil contamination at Berths 44 and 57); Id. Ex. 31 (Nov. 30, 1989 enforcement referral requesting followup inspection of SPBW at Berths 44 and 57 because of allegations of "illegal disposal of sandblasting spent sand offsite").

Plaintiff also contends that "compliance with disposal regulations was a common problem for boat yards inspected by [the City] in 1990." The fact that many companies might have been charged with polluting has no bearing on whether the insured has an obligation to disclose such information on an insurance application. It is self-evident that an insured must disclose an ongoing investigation and citations for pollution by a local agency, and that a failure to disclose such information would be material to an insurer's decision to insure.[6] Insurers provide insurance against the possibility of a loss in the future. An ongoing pollution investigation means the loss may have already occurred.

In his final supplemental briefing, Pringle also argues that disclosure of the City's investigation or notices of violations could not have been material to WQIS, because (as WQIS concedes) they would not have evidenced a nexus between the insured drydocks' "discharge" and the contamination, or that the notice of pollution was apparently unrelated to the insured vessels. The implication

---

[6] The materiality of the concealed information is determined "solely by the probable and reasonable influence of the [concealed] facts upon the [insurer] in forming [its] estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334. This is a subjective test; the critical question is the effect truthful answers would have had on the insurer at issue, not on some "average reasonable" insurer. Imperial Cas. and Indem. Co. v. Levon Sogomonian, 198 Cal. App. 3d 169, 181 (Ct. App. 1988).

1  of this argument is that Pringle could not have advised WQIS of

2  what it, itself, did not know.  This argument omits the crucial

3  fact that SPBW was aware that it had received a notice of violation

4  in 1989 for waste produced by "discharge" as well as the "disposal"

5  of waste at Berths 44 and 57, resulting from its sandblasting

6  activities.  (See Walsh Decl. Ex. 8.)

7       In sum, WQIS has presented uncontested evidence that SPBW

8  failed to properly disclose that it was under a multi-year

9  investigation for pollution by the County of Los Angeles resulting

10  in part from discharges from its vehicles at the time it applied

11  for the WQIS insurance policies.  The Court further finds that the

12  full disclosure of such investigation and notices of violation is,

13  under the circumstances of this case and as a matter of law, a

14  material fact.  Accordingly, WQIS was entitled to rescind its

15  policy.

16            2.   <u>Statute of Limitations, Waiver, Estoppel</u>[7]

17       Plaintiff argues that WQIS's argument for rescission is barred

18  by the statute of limitations, by waiver, and by estoppel.  The

19  Court rejects these contentions.

20            a.   <u>Statute of Limitations</u>

21       The California Code of Civil Procedure provides for a four

22  year statute of limitations for "[a]n action based upon the

23  rescission of a contract in writing."  Cal. Civ. Proc. Code § 337.

24  However, the California Supreme Court has explained that

25

26  _____

27       [7] As both parties agree, California law governs these issues.
    <u>See</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938) (holding that
28  federal courts presiding must apply state substantive law in
    diversity actions).

14

1    a defense may be raised at any time, even if the matter would
     be barred by a statute of limitations if asserted as the basis
2    for affirmative relief.  The rule applies in particular to
     contract actions.  One sued on a contract may urge defense
3    that render the contract unenforceable, even if the same
     matters, alleged as grounds for restitution after rescission,
4    would be untimely.

5    Styne v. Stevens, 26 Cal. 4th 42, 51-52 (Cal. 2001).

6         Plaintiff argues that Styne is distinguishable, and that the

7    statute of limitations therefore applies, because Styne only

8    applies to defenses based on fraud or misrepresentation, and

9    because WQIS is here acting in an affirmative rather than a defense

10   capacity by "bringing an action for relief based on rescission."

11   (Pringle Rescission Br. 14.)  The Court disagrees.

12        First, as to the fraud question, Styne explicitly states that

13   the "same reasoning" that excuses fraud and misrepresentation

14   defenses from the statute of limitations "applies to any grounds

15   for asserting the illegality of the contract upon which the

16   plaintiff sues."  26 Cal. 4th at 52 (emphasis added).  Moreover,

17   contrary to Plaintiff's contention, this is a case involving fraud

18   or misrepresentation.  Indeed, the Court has just found that the

19   undisputed facts showed that SPBW failed to disclose material

20   information when applying for the WQIS insurance coverage.

21        Second, WQIS is not acting in an affirmative capacity here.

22   The California Supreme Court has addressed this issue:

23

24        Styne asserts that Stevens has actually sought affirmative
          relief by asking, in effect, for a declaration that the
25        contract is void and unenforceable.  But the cases belie such
          an argument; one who raises the defense that a contract is
26        illegal and unenforceable necessarily asks for a determination
          to that effect.  If the result the defendant seeks is simply
27        that he or she owes no obligations under an agreement alleged
          by the plaintiff, the matter must be deemed a defense to which
28        the statute of limitations does not apply.

15

1   <u>Id.</u> at 53.  Here, SPBW brought an action alleging that WQIS owed

2   obligations under the insurance contracts.  WQIS responded by

3   asking for a declaration that the contract was void <u>ab initio</u> –

4   rescission.  WQIS is not seeking any relief based on the rescission

5   other than a declaration of the contract's invalidity.  <u>Cf.</u> <u>id.</u> at

6   51-52 (noting that a claim for <u>restitution</u> after rescission would

7   be affirmative, rather than defensive (emphasis added)).  In light

8   of <u>Styne</u>, WQIS's argument must be considered defensive, and

9   therefore the statute of limitations is not applicable.[8]

10                    b.   <u>Waiver/Estoppel</u>

11       "In the insurance context, California courts have applied the

12   general rule that waiver requires the insurer to intentional

13   relinquish its right to deny coverage . . . ."  <u>Ringler Ass. Inc.</u>

14   <u>v. Md. Cas. Co.</u>, 80 Cal. App. 4th 1165, 1188 (Cal. Ct. App. 2000).

15   Further, "[t]he burden is on the party claiming a waiver of a right

16   to prove it by clear and convincing evidence that does not leave

17   the matter to speculation, and doubtful cases will be decided

18   against a waiver."  <u>Waller v. Truck Ins. Exchange, Inc.</u>, 11 Cal.

19   4th 1, 31 (Cal. 1995)(internal alterations and quotation marks

20   omitted).  Plaintiff has not met his burden here.

21

22

23   ─────────────

24       [8] Plaintiff highlights the distinction between effecting a
     nonjudicial unilateral rescission and obtaining relief pursuant to
25   that rescission in court, but the Court finds that any such
     distinction, even assuming its legitimacy, is of no consequence
26   here.  Court approval of rescission as a form of relief is no
     different from court approval of any other contract defense.  The
27   California Supreme Court has made clear that urging the invalidity
     of a contract in response to a lawsuit is considered a defense.
28   Such a declaration may well be a form of relief, but it therefore
     is nonetheless a relief not subject to the statute of limitations.

1    Plaintiff's only evidence that WQIS intentionally relinquished

2  its rights is a March 1993 letter in which in SPBW wrote to its

3  insurers to

4

5          formally place [them] on notice . . . regarding SPBW's claim
           for defense and indemnification of all costs associated with
6          SPBW's alleged liability for investigation and remediation of
           contamination at the above-referenced site ("the site".)   In
7          June, 1990, the Los Angeles County Department of Health
           Services ordered SPBW to conduct an investigation and
8          remediate any contamination found in the northeast section of
           Berth 44.   The lead agency is now the Health Hazardous
9          Materials Division of the Los Angeles County Fire Department
           ("the County").

10  (Smith Decl., Ex. 9.)  This letter does not provide the requisite

11  clear and convincing evidence.   Specifically, the letter refers to

12  only to Berth 44, while the WQIS-insured drydocks were located in

13  Berth 57.   Contrary to Plaintiff's suggestion that the "notice is

14  clearly as to potential contamination at the entire site," the

15  "above-referenced site" in fact clearly refers to "Re: Billfish,

16  Inc. dba San Pedro Boat Work, Berth 44, San Pedro, CA 90731."

17  (Smith Decl., Ex. 9 (emphasis added).)   Moreover, the letter

18  mentions nothing about the actual violations issued, nor does it

19  detail the kind or degree of pollution at issue.   Such details

20  would surely be relevant before assuming that WQIS intentionally

21  waived related rights.   Accordingly, failure to act following

22  receipt of a vague letter about pollution at Berth 44 cannot

23  provide the strong showing necessary to demonstrate intentional

24  waiver of WQIS's rights regarding pollution at Berth 57.

25    Plaintiff's estoppel claim also fails because he cannot meet

26  two of the requirements for proving equitable estoppel:   that WQIS

27  knew all the relevant facts, or that WQIS intended that its

28  "conduct shall be acted upon, or must so act that the party

17

1  asserting the estoppel had a right to believe that it was so

2  intended." _Gaunt v. Prudential Ins. Co. of Am._, 255 Cal. App. 2d

3  18, 24 (Cal. Ct. App. 1967).  Plaintiff argues that the 1993 letter

4  provided WQIS with notice of the requisite facts, but as already

5  discussed the letter is insufficiently specific to justify a

6  finding that WQIS intended its silence to be acted upon, or a

7  finding that it was reasonable for SPBW to believe that WQIS so

8  intended.

9          3.   Conclusion – Pringle's and WQIS's Motions

10      Having rejected the statute of limitations, waiver, and

11  estoppel arguments, the Court GRANTS summary judgment in favor of

12  WQIS.  The WQIS Policies are hereby officially rescinded, and any

13  duties that might have arisen therefrom are unenforceable.

14  Therefore, Plaintiff's motion for summary judgment that WQIS had a

15  duty to defend arising from these Policies is DENIED.

16      B.   EPG's Motion

17      In September 2006, Defendant EPG filed a motion for summary

18  judgment arguing that SPBW was not the real party in interest and,

19  in any case, lacked standing to bring its claim because it had no

20  redressable injury.  In January and February 2007, the Court found

21  that SPBW did have standing and allowed Pringle, the bankruptcy

22  trustee, to substitute in as Plaintiff on the grounds that he is

23  the real party in interest.  Subsequently, in January 2008, the

24  Court requested supplemental briefing on whether it should

25  reconsider the standing question because the EPG insurance policies

26  left Plaintiff Pringle and Plaintiff-Intervenor City of Los Angeles

27  without a redressable injury.  After considering this supplemental

28  briefing, the Court now finds that Plaintiff and Plaintiff-

18

1    Intervenor have no redressable injury and, therefore, do not have

2    constitutional standing to bring this claim against EPG.

3         The crux of EPG's argument is that the EPG policies at issue

4    are indemnity, rather than liability policies.  Because indemnity

5    policies require that "payment" is a condition precedent to insurer

6    obligation, and Plaintiff has not made any payments, EPG is not

7    responsible.  Therefore, EPG argues that Plaintiff and Plaintiff-

8    Intervenor have no redressable injury in fact and lack standing.

9    As described below, the Court agrees.[9]

10             1.   The EPG Policies are Indemnity Policies

11        The EPG policies state in relevant part:

12             Limited U.S. Oil Pollution Insurance Policy

13        1.   Insuring Agreement
          In consideration of the premium stated herein and subject to
14        all of the terms, conditions and limitations contained herein,
          the Underwriters do hereby agree to indemnify the Assured for
15        such amounts in excess of the Underlying Limits . . . as the
          Assured shall, [as owner or operator of the Vessel(s) or
16        Facility(s) named on the Declaration pages], have become
          liable to pay and shall pay, by reason of or with respect to:
17
          FOURTH:  Costs, charges and expenses incurred, with the
18                 written consent of Underwriter, in defending against
                   or investigating or adjusting any liabilities
19                 insured against [under the policy]. . . .

20        III. CONDITIONS
               * * * *
21        4.   Attachment of Liability
          Liability to pay under this Policy shall not attach unless and
22        until the Assured has paid or has paid on its behalf any sum
          set forth in Sections . . . Fourth.

23

24

25

26        [9] In light of this determination, the Court need not reach
     EPG's argument that Plaintiff Pringle should not have been allowed
27   to substitute in as the real party in interest.  The Court also
     declines to address the question of whether SPBW's bankruptcy
28   affects standing.

                                     19

1   (Smith Decl. Feb. 11, 2008, Ex. 2, P02-P04.)[10]  Insurance contracts
2   can be either liability or indemnity policies.  "A liability policy
3   provides coverage for a loss which the insured becomes legally
4   obligated to pay, whereas an indemnity policy provides coverage
5   only for those losses actually paid out by the insured."  Save Mart
6   Supermarkets v. Underwriters at Lloyd's London, 843 F. Supp. 597,
7   603 (N.D. Cal. 1994).  Therefore, indemnity policies are not
8   triggered until the insured has actually paid for its losses.

9        The plain language of the EPG policies reveals them to be
10  indemnity policies.  Travelers Cas. and Sur. Co. v. Employers Ins.
11  of Wausau, 130 Cal. App. 4th 99, 115 (Ct. App. 2005) ("When an
12  insurance policy contains clear and unequivocal provisions, the
13  only reasonable expectation to be found is that afforded by the
14  plain language of the terms in the contract.")  Under the contracts
15  at issue here, EPG promised to "indemnify" SPBW the "for such
16  amounts . . . as the Assured shall, . . . have become liable to pay
17  and shall pay." (Pl. 2d Am. Comp. Ex. 3, 4.)  The contract also
18  emphasizes that "[l]iability to pay under this Policy shall not
19  attach unless and until the Assured has paid or has paid on its
20  behalf any sum set forth in Sections."  (Id.)  Accordingly, the

21  _____

22      [10] Plaintiff has objected to the declaration of EPG's attorney
    Forrest Booth, which attached as an exhibit the relevant policy
23  provisions, for lack of personal knowledge.  In spite of Pringle's
    suggestion that Booth's representation of the policy language might
24  be inaccurate, the policy language that the parties' both rely on
    is identical.  Because there is no actual dispute over the literal
25  wording of the policies, the Court denies Plaintiff's evidentiary
    objection as moot.  Further, the Court rejects Plaintiff's claim
26  that Booth has not established personal knowledge of the insurance
    policies because he only attached excerpts to his declaration.
27  Booth has submitted a declaration under penalty of perjury swearing
    that he has reviewed the policies.  He also attached to that
28  declaration what he believed to be the relevant provisions.  There
    is no prohibition on attaching relevant excerpts.

1   contract clearly states that EPG's liability is not triggered
2   "unless and until" SPBW has already paid or payments have been made
3   on its behalf. (Id.)

4       Plaintiff and Plaintiff-Intervenor argue that the policy
5   language is ambiguous because the words "shall have become liable
6   to pay and shall pay" could equally mean "must pay in the future"
7   as well as "has already paid." (See Pringle Suppl. Brief Re
8   Standing and Contract Interp. 8 & n.14.)   In the abstract, this
9   argument might have some merit.   However, in this case the
10  provision stating that "[l]iability to pay under this Policy shall
11  not attach unless and until the Assured has paid or has paid on its
12  behalf any sum" extinguishes any potential ambiguity and makes
13  clear that "shall pay" indeed means "has already paid."

14      Plaintiff Pringle next argues that the policies are not
15  indemnity policies because "what distinguishes indemnity contracts
16  from insurance policies" is that indemnity contracts "include a
17  duty to reimburse certain amounts paid upon judgment ("liability
18  imposed . . . by law") or agreement," but that the "EPG Policies .
19  . . have no language that conditions reimbursement on judgment or
20  settlement."   This is not correct.   As noted above, the
21  distinguishing factor between liability and indemnity policies is
22  whether the insured "suffers actual loss by being compelled to pay
23  the claim," not just whether a judgment imposing liability has
24  occurred.[11]   Gribaldo, Jacobs, Jones & Associates v. Agrippina

25  _____

26      [11] Indeed, the case Plaintiff relies upon for its "judgment"
    argument, In re Liquidation of Pine Top Ins. Co., 639 N.E. 2d 168,
27  170 (Ill. App. Ct. 1994), supports the Court's conclusion.   Pine
    Top states that "[t]he substantive distinction between indemnity
28  and liability policies is that payment of a claim by the insured is
                                                   (continued...)

_Versicherunges A._, 3 Cal. 3d 434, 447 (Cal. 1970).  Therefore,
contrary to Plaintiff's contention, the EPG policy language is
equivalent, though not identical, to the sorts of policies that
even Plaintiff and Plaintiff-Intervenor agree are indemnity
policies.  (_See_ Pringle Suppl. Brief Re Standing and Contract
Interp. 9 (citing as an example of an indemnity policy _Save Mart
Supermarkets v. Underwriters at Lloyd's London_, 843 F. Supp. 597,
603 (N.D. Cal. 1994), which had a policy that required the
reimbursement of "all _payments_ made").)

   Moreover, the Ninth Circuit has recently emphasized that one
of the three defining characteristics of a marine insurance policy
is that it is "a contract of indemnity."  _Certain Underwriters at
Lloyds, London v. Inlet Fisheries Inc._, 518 F.3d 645, 654-55 (9th
Cir. 2008).  The parties do not dispute that the insurance policies
at issue are contracts for "marine insurance."  _Inlet Fisheries_
confirms what the plain language of the policies already reveals:
the EPG Policies at issue in this case are contracts of indemnity,
and as such are only triggered upon payments actually made.

   2.   _Plaintiff and Plaintiff-Intervenor Have No
        Constitutinal Standing_

   "The irreducible constitutional minimum of standing requires a
plaintiff to show injury in fact, causation of that injury by the

---

[11](...continued)
a condition precedent to an insured's right to recover under the
form, but not that later [sic]."  Plaintiff urges that the
operative word in this holding is "claim," and that "claim" equals
"judgment."  The Court believes, rather, that the operative words
are "payment" and "condition precedent," and thus articulate the
same distinction between liability and indemnity policies as do the
authority cited by the Court.  To the extent _Pine Top_ can be
interpreted differently, however, the Court does not find this
reasoning persuasive.

1    defendant's conduct, and redressability of the injury by the

2    requested relief." Pershing Park Villas Homeowners Ass'n v. United

3    Pacific Ins. Co., 219 F.3d 895, 900 (9th Cir. 2000)(internal

4    quotation marks omitted).  The Court finds that Plaintiff and

5    Plaintiff-Intervenor can meet neither the first criterion nor the

6    third.

7         Having found that the insurance policies in question are

8    indemnity contracts triggered only by actual loss and payment of

9    funds by the insured, Plaintiff must show that some funds were

10   actually paid either by SPBW or on its behalf.  Otherwise, EPG

11   could not have injured SPBW by failing to reimburse.  Plaintiff and

12   Plaintiff-Intervenor concede that SPBW has not made any payments

13   itself.  Instead, they argue that SPBW's previous insurer, LMI, has

14   already made payments on its behalf, and that SPBW is responsible

15   for approximately $80,000 of those costs.  (Smith Decl. Opp'n to

16   Mot. Summ. J. ¶ 5.)

17        This argument, however, ignores the central components of an

18   indemnity policy, which are the payment of legal liability causing

19   actual loss to the insured.  See Superior Gunite v. Ralph Mitzel

20   Inc., 117 Cal. App. 4th 301, 312 (Cal. Ct. App. 2004)("[A]n

21   indemnitor is not obligated for a claim made against an indemnitee

22   until the indemnitee has incurred an actual loss by having paid the

23   claim.").  In other words, the loss suffered by the indemnitee must

24   be a consequence of payment, no matter whether that payment is made

25   "by or on behalf of" the indemnitee.  See Alberts v. American

26   Casualty Co., 88 Cal. App. 2d 891, 899 (Cal. Ct. App. 1948)("[T]he

27   indemnitor's liability for the loss does not arise until the debt

28   has been paid and the indemnitee has thus suffered a

1    loss.")(emphasis added).  In this case, a third-party liability

2    insurer, LMI, made payments to reimburse Plaintiff's defense

3    liability, but Plaintiff provides no evidence or allegation

4    demonstrating how these payments caused Plaintiff actual loss.

5    Therefore, this injury cannot be redressed by EPG.  Insurance

6    against liability <u>regardless</u> of loss is a different contract than

7    the one at issue here; and Plaintiff's argument is essentially

8    another way of saying that his insurance contract includes

9    liability instead of indemnity coverage.

10        Finally, the City suggests that Trustee Pringle has

11   independent standing because a successful lawsuit would aid the

12   bankruptcy estate by obtaining insurance proceeds.  This contention

13   begs the question, because a successful lawsuit is an impossibility

14   if there has been no injury in fact; there is simply no injury to

15   redress.

16        In sum, the EPG Policies are contracts of indemnity, triggered

17   only by payment by or on behalf of SPBW causing actual loss.  There

18   is no dispute that no such payment has been made and, accordingly,

19   there is no loss to indemnify.  Therefore, the Court reconsiders

20   its previous Order finding that SPBW had standing.  Based on a lack

21   of injury in fact, Plaintiff Pringle lacks standing to bring his

22   claims against EPG.  Consequently, the Court GRANTS EPG's motion

23   for summary judgment.

24

25

26   ///

27   ///

28   ///

**IV.   CONCLUSION**

Based on the foregoing analysis, the Court GRANTS WQIS' request for a declaration of rescission and GRANTS EPG's motion for summary judgment.  Pringle's motion for summary judgment that WQIS has a duty to defend is DENIED.


IT IS SO ORDERED.

Dated: August 6, 2009

                                        DEAN D. PREGERSON

                                        United States District Judge